Rebecca **EBERHART**, Plaintiff

v.

Larry G. **MASSANARI**, Commissioner of Social Security,[1] Defendant

No. 3:00CV0817.

United States District Court, M.D. Pennsylvania.

Nov. 19, 2001.

1. Larry G. Massanari became the Acting Commissioner of Social Security, effective March 29, 2001, to succeed Kenneth S. Apfel. Under Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), Larry G. Massanari is automatically substituted as the defendant in this action.

Peter B. Macky, Sunbury, PA, for Plaintiff.

J. Justin Blewitt, Jr., Assistant U.S. Attorney, U.S. Attorney's Office, Scranton, PA, for Defendant.

## *MEMORANDUM*

MUNLEY, District Judge.

Plaintiff Rebecca Eberhardt, asserting error in the denial of her application under Title II of the Social Security Act, (hereinafter "Act"), 42 U.S.C. §§ 401–433, has appealed the final decision of the Commissioner of Social Security, (hereinafter "Commissioner") to deny her claim for disability benefits. Before the court for disposition is the report and recommendation of Magistrate Judge Malachy E. Mannion endorsing the affirmation of the Commissioner's decision to deny benefits to the plaintiff. The plaintiff has filed objections to the report and recommendation. After a careful review, and for the reasons that follow, we will not adopt the magistrate's report. Rather, we will grant benefits to the plaintiff.

## Background

At the time of filing the instant complaint, the plaintiff was forty-five years of age and residing in Milton, Northumberland County, Pennsylvania. The defendant is the Commissioner of Social Security, who is charged with ultimate responsibility for determining eligibility for benefits under the Act. Plaintiff has a ninth grade education. She has a history of back problems and psychiatric disorders. Plaintiff maintains that her dysthymic disorder, anxiety, panic attacks, severe scoliosis, dermatitis, residuals from burns and severe menstrual problems have rendered her totally unable to work. Compl. ¶ 10. Plaintiff has psychological and physical problems. What follows is a brief sketch of both gleaned from the administrative record.

### A. Medical History

Plaintiff has a long history of psychological problems. In 1971, at seventeen years of age, plaintiff was hospitalized at Evangelical Hospital in Lewisburg, Pennsylvania. Her condition was described as follows: "This little girl has a bizarre history of having episodes of choking with inability to swallow and pain in the chest and abdomen. This has always been worse at her menstrual period. Two days ago she developed a severe nervous spell with some evidence of psychosis." R. 155.[2]

Plaintiff was diagnosed with schizophrenia, chronic undifferentiated type. (R. 154). Additionally, she developed catatonia while being treated. Her hospitalization lasted eleven days, and she was treated with Cogentin and Thorazine. (*Id.*).

In February of 1973, plaintiff, suffering from hallucinations and paranoia, again entered the Evangelical Community Hospital. During her thirteen-day stay, doctors diagnosed her with schizophrenic reaction, paranoid type. Her doctors prescribed the medication Prolixin. (R. 160.).

The Evangelical discharge summary states that she had been hospitalized with similar complaints in 1972 and showed improvement during that hospitalization. Her family, however, was uncooperative and discontinued the 1972 treatment. Plaintiff rapidly regressed. (R. 160.).

A subsequent hospitalization at Evangelical Hospital occurred on March 6, 1979. Plaintiff's doctor diagnosed her with schizophrenia, anxiety, depression, probable endometriosis, and mild hypothyroidism. She was placed on Mellaril. Her symptoms included extreme agitation, disorderliness, distrustfulness, insomnia, anorexia and wishes for death. (R. 177.). After a six day stay, the hospital transferred plaintiff to Geisinger Medical Center where she was deemed to be suffering from schizophrenic reaction chronic undifferentiated type. She was treated with Mellaril. (R. 184.).

Plaintiff next received mental health treatment from Dr. Nicholas Danforth at Geisinger in 1987. (R. 203). Dr. Danforth's impression was that she suffered from generalized anxiety disorder with the possibility of superimposed panic attacks of a mild variety, avoidant personality disorder and anxiety induced insomnia. (R. 204). The doctor noted that supportive psychotherapy would be helpful but was not a viable option due to the negative reaction of plaintiff's husband. (R. 205).

Dr. Danforth described the plaintiff as follows: "an extraordinarily anxious and essentially disenfranchised human being with a pervasive, probably lifelong, generalized anxiety with severe insomnia and a tendency to probable panic attack." (R. 204).

2. The administrative record shall be cited as "R. _____."

At the request of the Social Security Administration, Jacqueline Sallade, Ed. D., (hereinafter "Dr. Sallade"), a clinical psychologist, performed a consultative examination of the plaintiff in 1997. She diagnosed the plaintiff with dysthymic disorder and panic disorder (mild). (R. 283). She concluded that the plaintiff could "possibly be in some work environments but not most" and that she could "tolerate some stress and pressures associated with regular part time activities, but not full time." (R. 284). Dr. Sallade's findings are discussed more fully below.

In addition to the psychological ailments that the plaintiff has suffered from, she has also been treated for some physical problems. At five years of age, plaintiff suffered severe burns on her back and thighs, resulting in extensive scarring. (R. 47, 136, 161).

Plaintiff also has cicatrical scoliosis of the spine, perhaps due to the scarring, which has been described as marked (R. 161) and severe (R. 191). Due to the condition she has pain while standing, doing housework or sitting (R. 60–62). Chiropractors treated her for many years, but she discontinued the treatment because her husband's insurance would not cover it, and she cannot afford it. (R. 56–57, 280). Plaintiff treats the pain with over-the-counter pain medicine. (R. 62).

Other conditions that the plaintiff suffers from include asthmatic breathing problems (R. 57, 288), dermatitis or dry flaky skin (R. 161, 210–211, 331, 334), and severe menstrual problems (R. 180, 264). Her menstrual problems last for approximately one week each month during which she is in a bad mood, very emotional, easily upset and wants to be left alone. (R. 56, 70–71).

**B. Procedural history**

Plaintiff applied for Supplemental Security Income (SSI) on May 16, 1997. Her application was denied initially and on reconsideration. Administrative Law Judge Jasper Bede, (hereinafter "ALJ"), also denied the claim. Plaintiff appealed to the Appeals Council, which denied the appeal on March 3, 2000. Consequently, the ALJ's decision became the "final decision" of the Commissioner.[3] Thus having exhausted her administrative remedies, plaintiff now seeks review with this Court.

**Jurisdiction**

This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) both of which permit review of final administrative decisions that deny claims for benefits under Title XVI of the Social Security Act.

**Standard of Review**

In disposing of objections to a magistrate's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made. 28 U.S.C. § 636(b)(1)(C); *see also Henderson v. Carlson,* 812 F.2d 874, 877 (3d Cir.1987). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions. *Id.*

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir.1988); *Mason v. Shalala,* 994 F.2d 1058 (3d Cir.1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

**3.** Hence, for the remainder of our memorandum, the terms "ALJ" and "Commissioner" are used interchangeably.

support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is less than a preponderance of the evidence, but more than a mere scintilla. *Id.*

### Discussion

Disability is defined in the Social Security Act in terms of the effect a physical or mental impairment has on a person's ability to perform in the workplace. 42 U.S.C. § 423(d). In order to receive disability benefits, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A). The Act further provides that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); *Heckler v. Campbell,* 461 U.S. 458, 459–60, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

■ In the analysis of disability claims, the Commissioner employs a five-step sequential evaluation. 20 C.F.R. § 416.920. The initial three steps are as follows: 1) whether the applicant is engaged in substantial gainful activity; 2) whether the applicant has a severe impairment; 3) whether the applicant's impairment meets or equals an impairment listed by the Secretary of Health and Human Services as creating a presumption of disability. If it does not the claimant must show: 4) whether the applicant's impairment prevents the applicant from doing past relevant work; See 20 C.F.R. §§ 404.1520, 416.920. If the applicant establishes steps one through four, then the burden is on the Commissioner to demonstrate the fifth step, that there are jobs in the national economy that the claimant can perform. *Jesurum v. Secretary of the U.S. Dept. of Health and Human Services,* 48 F.3d 114, 117 (3d Cir.1995).

In the instant case, the ALJ addressed the steps and found as follows: 1) Plaintiff has not engaged in substantial gainful activity since the filing of her application; 2) plaintiff has scoliosis of the spine, residuals of third degree burns on the back, asthma, a panic disorder and a depressive disorder, impairments that are severe; 3) Plaintiff's impairments do not meet or equal the criteria of any of the impairments listed in "Appendix 1, Subpart P, Regulations No. 4"; 4) Plaintiff has no vocationally relevant past work experience; and 5) Plaintiff is unable to perform the full range of light work; however, she is capable of making an adjustment to jobs that exist in significant numbers in the national economy including light janitorial worker, cafeteria attendant and a companion. (R. 23–24).

The plaintiff claims that the Administrative Law Judge, (hereinafter "ALJ"), did not base his decision on substantial evidence and that the plaintiff, in fact, has experienced lifelong debilitating psychological problems. Plaintiff states: "The ALJ obviously did not want to grant benefits to this woman, and set about discrediting her testimony and misconstruing medical evidence most helpful to her claim." Brief in Support of Objections to Magistrate Judge's Report at unnumbered pg. 1.

### A. Step 3: Whether Eberhart's Impairment Matches or is Equivalent to a Listed Impairment

■ In step three of the analysis set forth above, the ALJ must determine if

the applicant's impairment matches or is equivalent to, one of the listed impair-· ments. *Jesurum,* 48 F.3d at 117 (3d Cir. 1995). An applicant is *per se* disabled if the impairment is equivalent to a listed impairment and no further analysis is necessary. *Burnett v. Commissioner,* 220 F.3d 112, 119 (3d Cir.2000).

In the instant case, the ALJ's analysis of step three was as follows:

> At the third step of the analysis, it must be decided whether the claimant has impairments which meet the criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 C.F.R. Part 404, Subpart P, Appendix). Since no treating or examining physician has mentioned findings that specifically meet or are equivalent in severity to the criteria of a listed impairment, the Administrative Law Judge has concluded that the claimant's impairments, both singly and in combination, do not meet or equal the criteria of any listing. In reaching this conclusion, the undersigned has considered the opinion of the State Agency medical consultants who evaluated the issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion. (20 C.F.R. §§ 416.927(f) and Social Security Ruling 96–6p).

R. 18.

■ The Third Circuit Court of Appeals requires the ALJ to set forth the reasons for his decision. A simple summary con-

clusion that the applicant's impairments do not meet or equal a Listed Impairment without identifying the relevant listed impairments, discussing the evidence, or explaining the reasoning is a bare conclusion that is beyond meaningful judicial review. *Burnett,* 220 F.3d at 119. As in *Burnett,* the ALJ in the instant case does not identify the relevant listed impairments.[4] The *Burnett* court explained placing this burden on the ALJ as follows:

> Putting the responsibility on the ALJ to identify the relevant listed impairment(s) is consistent with the nature of Social Security disability proceedings which are "inquisitorial rather than adversarial" and in which "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 2081, 147 L.Ed.2d 80 (2000)(citing *Richardson v. Perales,* 402 U.S. 389, 400–01, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

*Burnett,* 220 F.3d at 120, n. 2.

In the instant case, the ALJ did not identify the relevant listed impairments. Accordingly, we have no way to review the ALJ's step three determination. We need not vacate and remand on this ground though, because as set forth below, we find that the magistrate's determination that the plaintiff has the residual functional capacity to perform light work is not supported by substantial evidence, and we will award benefits on that basis.

---

**4.** The Code of Federal Regulations explains as follows how medical equivalence is determined: "We will decide that your impairment(s) is medically equivalent to a listed impairment in appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairments(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the list-

ed impairment. If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal. If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairment to determine whether the combination of your impairments is medically equal to any listed impairment." 20 C.F.R. § 404.1526 (2001).

## B. Step 5: Residual functional capacity

Step 5 of the ALJ's analysis requires him to determine the claimant's residual functional capacity. "Residual functional capacity" is that which an individual is still able to do despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).

In step 4 of his analysis, the ALJ determined that the plaintiff has "retained the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls. The evidence supports a finding that she is not able to lift and carry more than 20 pounds or more than ten pounds on a regular basis." (R. 21).

Specifically, "light work" is described as follows in the Social Security Regulations:

[Light work] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities.

20 C.F.R. § 404.1567(b).

Plaintiff claims that the ALJ made several errors in concluding that the plaintiff retains the ability to perform light work. We are in agreement. The ALJ bases his decision on discrediting the plaintiff and affording little weight to the report of Dr. Sallade. We find that his decision in both these areas is not supported by substantial evidence.

The ALJ does not specifically state the reason why he discredits the plaintiff's testimony regarding her symptoms and limitations. It is apparent from his decision, however, that he discredits her, at least in part, because she has not sought out treatment that would lessen her disability. We find that in the instant case, the plaintiff's failure to seek out certain treatments does not discredit her testimony.

For example, the ALJ emphasizes that the plaintiff declined supportive psychotherapy as discussed by Dr. Danforth. However, the doctor's report reads as follows: "Supportive psychotherapy would be very helpful for this patient but I believe she is correct when she states that her husband's reaction to this idea will be so negative that it is not a viable option." R. 205. Therefore, not only did the patient refuse, as indicated by the ALJ, but her doctor agreed that it was not a viable option. Hence, the ALJ's conclusion that the plaintiff has "consistently declined to undergo mental health counseling" (R. 19) does not indicate that she does not suffer from disorders that would benefit from such counseling. In a related way, the ALJ notes that the plaintiff found chiropractic treatments to be helpful for her back pain, but discontinued them in March 1998. He does not state that the reason for the termination of treatment was that she had no money to pay for them. (R. 56).

Another way in which the ALJ attempts to discredit the plaintiff is as follows: "Ms. Eberhart testified that her panic attacks last for two to three hours at a time, yet she told Ms. Sallade that they lasted only 10 to 15 minutes." (R. 20). The ALJ is incorrect. The plaintiff did not testify that her panic attacks last two to three hours.

The following testimony was presented at the hearing:

Q. How long's it [the panic attack] last?

A. Well, the longest was like two hours or three hours I believe.

Q. And when was that?

A. I had them, I have one once a day usually.

Q. Well, when did you have the one that, that you, stands out in your mind as the longest one, the one to two or——

A. About two weeks ago.

R. 46.

It is apparent from the testimony, that when the plaintiff was discussing the two-to-three-hour attack, she was speaking of the longest attack, not the typical every-day attack. Accordingly, this is not substantial evidence upon which the ALJ can rely to discredit the plaintiff's testimony because she claimed the daily variety was ten to fifteen minutes when she talked to Dr. Sallade. (R. 285).

■■■ The ALJ apparently scoured the record to find every possible means to discredit the plaintiff, and make it appear that her disability left her with a residual ability to perform work. As discussed above, however, we find that the ALJ's decision to discredit the plaintiff's testimony is not supported by substantial evidence. Our conclusion is especially apt in light of the fact that none of the medical or psychological reports support a finding that she was exaggerating her symptoms. "Testimony of subjective pain and inability to perform even light work is entitled to great weight, particularly when . . . it is supported by competent medical evidence." *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir.1979). Corroborating medical evidence must support an ALJ's finding that a claimant lacks disabling pain. *Smith v. Califano*, 637 F.2d 968, 972 (3d. Cir.1981). In the instant case, no medical evidence was presented to establish that the plaintiff does not suffer to the extent that she claims.

■ Moreover, the ALJ's decision to afford little weight to Dr. Sallade's report is not supported by the record. The ALJ is quite critical of Dr. Sallade. He points out that she is not a medical doctor, but rather has her doctorate in education and refers to her as "Ms." instead of as "Dr." (R. 21).

He claims that Dr. Sallade's opinion that the plaintiff is unable to work full-time "appears to rest at least in part on an assessment of the claimant's physical impairments, which are outside of her [Dr. Sallade's] area of expertise." (R. 21). We disagree. The doctor's conclusion is that "[Plaintiff] could tolerate some stress and pressures associated with regular part time activities, but not full-time." (R. 284). "Stress" and "pressures" are psychological concerns, the area in which Dr. Sallade does have expertise.

The ALJ further discredits Dr. Sallade's opinion because she "uncritically accept[ed] as true most, if not all, of what the claimant reported." (R. 21). Dr. Sallade is a trained psychologist. Accordingly, it is within her area of expertise to be able make a determination as to whether or not a patient is accurately reporting her symptoms and problems. To this end, she found the plaintiff to be a "reliable reporter." (R. 283). For the ALJ to question that determination with no basis is merely trying to substitute his own lay opinion for the uncontradicted psychological evidence. Moreover, Dr. Sallade's opinion is in line with all of the plaintiff's previous psychological history. ALJs may not ignore consistent medical evidence showing disability in favor of their own opinion that there is no disabling impairment. *Allen v. Bowen*, 881 F.2d 37, 41(3d Cir.1989) (citing *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).

In addition, in reviewing the relevant psychiatric record the ALJ made serious errors and omissions. First, the ALJ completely ignored the March 1979 Evangelical Hospital stay that we have discussed above. In addition, his presentation of the 1979 Geisinger hospitalization is very brief, and he states that the plaintiff refused further treatment. (R. 16). The doctor's actual words are a bit more compelling. He wrote: "At the time of her discharge, it was felt that she still showed marked ambivalence, and she was really probably unable to take care of herself very adequately, so that the dilemma was that we had a woman who could use, and who needed, further treatment but refused it and was not committable. Her husband seems to accept her rather marginal functioning, and she will be sent home with a guarded prognosis. Ideally, two to three months in the State Hospital would be indicated . . . ." R. 185.

In reviewing the 1987 report of Dr. Danforth, the ALJ emphasized those portions of the report that support a denial of benefits and either ignored or gave little weight to those portions that supported the plaintiff's position. For example, he notes that Dr. Danforth claimed that the plaintiff was nondepressed, alert, cooperative, friendly and articulate. (R. 16). However, he does not mention that Dr. Danforth also stated that the plaintiff was an "extraordinarily anxious and essentially disenfranchised human being with a pervasive, probably lifelong, generalized anxiety with severe insomnia and a tendency to probable panic attacks." (R. 204).

Moreover, the ALJ made careless errors such as claiming that Dr. Danforth examined her as recently as March 1997 and found her to be alert and cooperative and that Dr. Sallade saw her two months later. (R. 19). Actually, Dr. Danforth examined the plaintiff in March of 1987. (R. 203). Another example is that he correctly states in one portion of his decision that the plaintiff has a ninth grade education (R. 14) and at another point claims that she has a tenth grade education. (R. 18). These errors merely illustrate the apparent carelessness that the ALJ used in reviewing the record.

In addition, the ALJ disregarded the claimant's complaints of menstrual cycle symptoms because she was not credible. As set forth above, the ALJ's conclusion that the plaintiff was not credible is not supported by the record; therefore, we find his conclusion to disregard her menstrual problems to lack a basis in substantial evidence. Moreover, the evidence of these problems was not merely from the plaintiff herself. Her husband testified as to the problems. (R. 70). The vocational expert noted that if the menstrual problems disrupted the plaintiff for a week at a time, as she claimed, that they would preclude employment. (R. 69).

Finally, the record is replete with references to the plaintiff's insomnia. Because the ability to engage in substantial gainful employment "means more than the ability to do certain of the physical and mental acts required in the job; the claimant must be able to sustain the activity through continuous attendance in a regular work-week." *Dobrowolsky v. Califano*, 606 F.2d 403, 408, (3d Cir.1979). Therefore, in cases dealing with the inability to sleep, it is valuable to probe the vocational expert regarding that limitation. *Id.* No such inquiry was made of the vocational expert in the instant case.

Based on all of the above, we find that the ALJ's decision is not supported by substantial evidence. All the evidence of record supports a finding that the plaintiff is disabled. No evidence was presented to the contrary. The ALJ merely refused to

believe the plaintiff and afforded little weight to the examining psychologist.

■ The remaining question is whether this case should be remanded to the Secretary for further proceedings or reversed with a direction that benefits be awarded. A district court, after reviewing the decision of the Secretary may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the Secretary's decision with or without a remand to the Secretary for a rehearing. *Pagan v. Apfel,* 1998 WL 962120 (E.D.Pa.1998).

■ The district court can award benefits only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits. *Gilliland v. Heckler,* 786 F.2d 178 (3d Cir. 1986); *Tennant v. Schweiker,* 682 F.2d 707, 710 (8th Cir.1982). When faced with such cases, it is unreasonable for the court to give the ALJ another opportunity to consider new evidence concerning the disability because the administrative proceeding would only result in further delay in the receipt of benefits. *See Livingston v. Califano,* 614 F.2d 342, 345 (3d Cir.1980). The decision whether to reverse or remand lies within the discretion of the court. *See, e.g., Gilliland,* 786 F.2d at 185; *Rini v. Harris,* 615 F.2d 625, 627 (5th Cir.1980); *Tustin v. Heckler,* 591 F.Supp. 1049, 1059 (D.N.J.1984), vacated in part and remanded, 749 F.2d 1055 (3d Cir.1984) (finding that in fiscal 1983, in 29.4% of "Disability Final Court Decisions" by district courts, the Secretary's disability determinations were reversed without remand).

In the instant case, we find that the record is extensive and well developed. We are faced with a claimant who suffers from a severe impairment, and she has no relevant past work history. The record contains over three hundred pages and includes the medical records of the several doctors who have examined the plaintiff. Substantial evidence in that record indicates that the plaintiff is disabled and entitled to receive benefits without further extended delay. For these reasons, we see no reason to remand for further consideration of whether the Claimant is disabled.

We have determined, therefore, that this case should be reversed, with direction that the benefits be awarded to the claimant. We find that the ALJ's decision that the plaintiff is not disabled under the Act is not supported by substantial evidence.[5] Accordingly, the magistrate's report and recommendation shall be not be adopted. An appropriate order follows.

### ORDER

**AND NOW,** to wit, this 19th day of November 2001, it is hereby **ORDERED** that:

1) The plaintiff's objections [17–1] to the magistrate's report and recommendation are **SUSTAINED** and the report and recommendation of the magistrate [16–1] is not adopted;

2) Disability benefits are awarded to the plaintiff;

3) The Clerk of Court is directed to remand this case to the Commissioner of Social Security for a determination of the amount of the benefits; and

4) The Clerk of Court is further directed to close the case in this Court.

---

**5.** *See e.g. Glassic v. Heckler,* 1986 WL 8495 (E.D.Pa.1986) (finding that the ALJ's determination that the claimant was not disabled should be reversed and that disability benefits should be awarded).